Good morning, everyone. Good morning to the Ninth Circuit. We have three cases that we have for argument today. Two additional cases have been submitted on the briefs, and they are Leap v. Nordstrom. That's 23-2661. In addition, Green Technology Lining Corp. v. Cruz & Associates Insurance, 24-66. That matter is also submitted on the briefs. Our first matter that we have for argument is Friends of Gualala River v. Gualala Redwood Timber. So whenever, Counsel, you're ready, you can proceed. Thank you, Your Honor. If it may please the Court, I'm Stuart Gross on behalf of Plaintiffs, Appellants, Friends of Gualala River, and Center for Biological Diversity. The principal question in this appeal, and I'd like to reserve three minutes for rebuttal. Very well. The principal question in this appeal is one of basic due process. Can the Center for Biological Diversity lose forever its right to bring a de novo Endangered Species Act claim in federal court based solely on a finding that it shares the same interests as another party, and that party lost a state administrative law proceeding in state court? Well, talk to me about Atwell and distinguish why that is not controlling and there is no privity under California law. Thank you, Your Honor. So in Atwell, there was actually no issue raised about due process limitations. I direct the Court to Arias v. Superior Court. That is the Supreme Court case. It is 46, Cal Fourth, 969, 2009. In that court, the California Supreme Court cited Taylor to define the contours of parties, the categories of parties. That could be held to be in privity. Atwell is the 2018 case that's not been overruled, has it? Correct. It is not, but, Your Honor. So distinguish that for me because I'm not sure I understand. I understand that it was a Supreme Court decision. I guess I don't understand why Atwell is wrong. Right. Why? What I would say, Your Honor, is this. In Atwell, it appears based on the argument that the party against who, the absent party, did not raise the issue of due process limitations. And if you look at the case that Atwell relies predominantly on, I think it's called, and I may have it slightly wrong here, Your Honor, Pentaere, along those lines. If you look at that case, at the bottom of that case, it notes that the party against who, the absent party, raised the due process concerns late, had not raised them below, and they were deemed waived. So that was a case in which Atwell and the one before it, where a party did not raise those due process concerns. I'd also point, Your Honors, to Richards and South Central Telephone. Both of those cases make very clear that while states' courts are free to, are free to apply their own res judicata rules, they are bound as they have to be by the limitations of the 14th Amendment's due process guarantees. And in Atwell, the issue... So, you're asking us to, you're asking us to hold this entire area of law in California unconstitutional is what you're asking us to do. Absolutely not. So, in Arias, the Supreme Court, the California Supreme Court, made clear that California res judicata law, its privity rules in particular, are unconstitutional. Hemmed in, if you will, by the 14th Amendment's due process guarantees. So, we are not saying in any way that the primary rights theory is intrinsically unconstitutional or that California's privity rules are intrinsically unconstitutional. They simply must be applied in a way that's consistent with what the Supreme Court in Taylor, Richards, South Central Telephone, all found were the limits of privity that can be applied in any setting. And I'd point your honor also to the defendant's brief, where they acknowledge, they acknowledge that the 14th Amendment's due process guarantees, as articulated by the Supreme Court in Richards, they do define the outer contours by which the res judicata rules of states can be applied. And Richards and South Central Telephone, as I've been noting, the reason I'm noting that is both of those cases dealt with Alabama state res judicata rules. So, just as in any setting, you, a state is not free to compromise the constitutional rights of people before it, the same is true with res judicata rules. Weren't, weren't, weren't you all seeking the same injury, excuse me, identifying the same injury and seeking the same relief? In the two cases? Yes. No. So, yeah, the, the first case, so if you look at primary rights, and so if we want to dive into that, what's critical there, and the Adams Farming case, I believe, defines this well. It's won by this court from 1994, I believe. What you look at is the right and the duty of the particular defendant. Here, what we're talking about is both a different right, a different duty, and a different defendant. In the state court proceeding, what Friends of Guala River was doing was suing the California Department of, CAL FIRE. CAL FIRE, not Guala Redwood Timber, different defendant. It was also suing to compel the California Department of Fire to redo its analysis of the THP. That is not the relief that was being sought here. The relief that was sought in this case was very straightforward. It was prevent the take of species that were listed as threatened and that were listed as endangered. That is a different right and is a different duty of a different defendant. Okay. Counsel, I'd like you to assume that I don't think that, that your, that your clients are subject to res judicata, that they can, that they can maintain the suit. Why isn't the case moot? Absolutely, Your Honor. The case is not moot because the court can still remedy the harms that the plaintiffs have identified. What authorizes us to remedy the harms? You're suggesting that the court can craft mitigating measures? Well, we can request those mitigating measures, and we did. Request those mitigating measures from whom? From Guala Redwood Timber. Right, but enforced by whom? Who gets to determine what's adequate? Well, what would determine what is adequate, Your Honor? That would be subject to expert testimony. So But, yeah, but you're, but you're asking, ultimately, though, you're asking the court to impose this.  Okay. What authorizes us to impose mitigating measures in an ESA case? Thank you, Your Honor. So I would point, Your Honor, to the most recent case in this long line of cases that defines mootness about whether or not a remedy is available. This case, the case in particular is NRDC v. Hanlon. That was an Endangered Species Act case. The court has the authority to craft remedies to prevent ongoing take, which is what plaintiffs allege is occurring here. And we have, in our complaints, specifically defined measures we're asking. In that case, had the take taken place? In that case, that was a Section 7 case. Section 7 is very different. In Section 7, there is statutory authorization for the idea of mitigating circumstances. That is, the agency is told that they may offer reasonable and prudent alternatives. That language does not appear in Section 9. What's available in Section 9 is an injunction which you didn't appeal. We did, we've appealed You dismissed it. Right. We appealed the preliminary injunction. That's right. Right. So, and that's correct, Your Honor.  And we did that because An injunction against the take is no longer available to you in the sense of preventing the take of the trees. I would point, well, it was not the trees that we were focused on. It was the salmonids, the frogs, and certain types of birds. But the take was caused by the timber activities, which no longer are taking place and cannot be in violation of the ESA under Section 9. Isn't that correct? Your Honor, as we allege in the complaint, the effect of those taking, of those removal of the trees is ongoing and continuing. So there is still How can you enjoin the effect? This is tree cutting when the tree has been cut. I'm missing something. So, Your Honor, without diving too far into the weeds, for example, one of the allegations we had of take was habitat modification, that there was harassment being caused by the deprivation of woody debris and for increased sediment. That's gone. That's over with. But you could bring woody debris, Your Honor, back into the streams. So there are measures that can be taken now. So is an ESA suit continue to be open after the take has occurred? So even if the agency had approved the take, you can come in years later and ask for mitigating circumstances? So, Your Honor, in a circumstance where the take had fully occurred prior to the filing of the lawsuit, I will not opine about whether or not that lawsuit could be brought. That would be one of standing, which Laidlaw makes clear is a different standard than one of mootness. So what we have here is a situation where there certainly was not a take when we filed this action. Once that action was underway, then certain of the measures we were seeking to stop occurred, but there is still remedy that can be provided. The suits that involve measures, of course, are actions involving the Secretary's approval of the project. And, again, under Section 7, reasonable and prudent measures may be taken by the Secretary as a condition of getting the take. That's no longer possible, and you're now asking us to step in in place of the Secretary after the take has occurred and order who knows what. Your Honor, may I — I've gone over my time. May I continue? I'm going to ask the Chief to allow you to answer these questions. Okay. I'd point, Your Honor, to Cantrell. So Cantrell involved both the Navy and Long Beach. And in that case, what you had was a situation where a number of buildings had been destroyed. And the plaintiffs alleged that the habitat of certain birds was disturbed thereby. And the defendants in that case, including Long Beach and the Navy — and the Navy in this situation was not a regulator, it was an owner — they — the defendants said, there's nothing more you can do here. You cannot rebuild the buildings. This Court said that is not correct, that that results in mootness, because there is still things that could be ordered to mitigate the harm. That, of course, is a NEPA case, not an ESA case. That's correct, Your Honor. And it seems to me that it does make a difference, because your remedy in a Section 9 case against a private party is an injunction. And I don't see that reasonable and prudent measures is in the statutory language. And, Your Honor — That's what the Secretary may require as a condition. And one of the reasons that that's fair, looking at the broad scheme, is because then the applicant knows whether the cost of conducting the take is worth the price. And in this case, we're talking about imposing something post hoc. And I think I'd point to a couple things, Your Honor. First, there was never an incidental take permit that was applied for here. So there were never reasonable and prudent measures that GRT was informed it should take by the only agency that could have given it immunity from such take. That's the first. The second is, I would — that a district court, its injunctive powers are broad. And that's what all of these cases that we rely on for the proposition that this case is not moot stand for. And given that breadth of injunctive power, the Court is — has the authority to craft vis-a-vis this defendant measures that would mitigate take that has already occurred and that is continuing to occur. And — I went through these cases last night. I made — maybe I didn't go through all of them, but I went through — I certainly went through Cantrell and Cuddy and a number of — a number of others that have been cited to us. In all of those cases, the one thing that I noted was that the relief was sought against the agency, not against the applicant. And, Your Honor, I don't believe respectfully in Cantrell. That's correct. Because — Cantrell may be different, but again, you're not — that's not ESA. It's a different statutory scheme. It's a different problem. It is a different statutory scheme, but I'd actually, Your Honor, if we're talking about NEPA versus Endangered Species Act, the breadth of relief that's generally available in an Endangered Species Act case relative to a NEPA case, it's actually far more relief is available in ESA Section 9 than NEPA. In a NEPA case, all you can get is go back and redo it. Right? In an Endangered Species Act, the injunction is stop that take or remedy that take. That is actually a broader injunctive power that is given to courts than courts have in a NEPA context. Counsel, I think you've gone over a little bit, so I'll give you a minute afterwards and we'll hear from the other side. Thank you very much, Your Honor. Good morning, and may it please the Court. Navi Dhillon from Paul Hastings IV, Respondent. I will keep my remarks relatively brief. I'm happy to answer any questions. For better or for worse, I litigated all the State court proceedings, so I'm very familiar with the underlying record. I would give this observation. The Federal case and the State case involved the same injury, the same relief, the same species, the same parties, save for CBD, and I'll say a bit about CBD. I think the question about or the comment about Atwell and the State court judgment, we think the lower court got it exactly right, that the court of rendition here for the judgment, its substantive law for judgment purposes applies, and I think that really How do you deal with Taylor? So the first point is Taylor, that dealt with a Federal judgment, and under substantive choice of law rules, Federal judgment law applies. Has it been cabined to Federal law? I believe that California's jurisprudence on res judicata complies fully with Federal law. This court, in fact, has cited California res judicata laws many times post-Taylor, including in the last three or four years, so we don't see any conflict between Federal law and State law from the perspective of the due process clause. Counsel, it's pretty clear that Judge Donato was not real patient with sort of the tag team approach that was taken here. Let's suppose that the Federal lawsuit had only been filed by the Center for Biological Diversity and not by the Friends. So would res judicata still have applied in that case? Your Honor, I think it would depend on the underlying facts. I could see in a case Well, you know the underlying facts, so tell me whether in this case CBD would have been I think the answer there is yes, Your Honor. That the record here before the Court shows that there were multiple comment letters submitted by Fogger and their expert, Mr. Peter Bay, and I can give the record citations to that. Supplemental ER 122 to 170 from 2016 to 2019. In each of those letters there are detailed comments about species impacts to CAL FIRE and That suggests that we have some kind of identity of issues. I'm still trying to figure out why CBD would be barred from bringing this ESA suit as a separate suit if it was not a party to the original suit. So this goes to the question of privity, Your Honor, that you don't necessarily need to be a formal party for purposes of res judicata under California law. And I was referencing those facts to show, contrary to the argument from appellants, CBD was no stranger to the underlying proceedings. And from our perspective Not a stranger in what sense? In the sense that it was fully on notice of the issues that were On notice. I mean, you could just be reading the newspapers, right, and figure all of this out. You can be just an alert observer. But why would you then suspect that you would be barred from bringing a suit under a different statute in a different court? So, Your Honor, I guess it depends on whose perspective we're looking at this from, that from the perspective of CBD, would it be surprised that if it filed a separate lawsuit, it would be barred from challenging the same determinations made by a state court agency to reduce to a final judgment? We don't think that should be a surprise. That should be a feature of judgment law, that at some point all things must come to an end. And the state court proceedings, at the center of them, there is a requirement under state law that CAL FIRE make a determination that the THP complies with federal law. And that's a point that we made in our papers. The lower court made that observation as well. And that's a point that appellants don't have yet to provide a response to. That, in effect, the federal action is a collateral attack on the state court action, which wasn't merely an administrative action. This was a mandamus proceeding brought under state law. We were joined as a party in that action as a real party. We were under an injunction for many years. And they had every opportunity to challenge the ESA determination that CAL FIRE necessarily was required to make, which overlaps completely with the issues in the federal action. And on the point of mitigation, I heard the questions about the trees have been felled, the goal posts have now moved to, well, we're worried about mitigation. That, in fact, was what we litigated in the state court proceedings. Where there's a suggestion that there is a preference for take authorization, that this is a context where the case was focused on avoidance, that avoidance is preferable to allowing take. And so in the state court proceedings, the whole debate was, can you structure THP operations that would avoid take? And that was the goal, and mitigation was litigated to make sure that happened. And it was carefully reviewed by the superior court and the first appellate district here in San Francisco in a very detailed decision that looked at all of these potential impacts. On the question of mootness to Judge Baez's question about the trees have been felled, we've made the same observation that if you look at the take mechanisms, take the red-legged frog, there's an allegation that the red-legged frog, there could be take because of the felling of the trees. The trees are on the ground. And so from our perspective, that take mechanism is no longer viable. And, again, now it's really a case about litigating the adequacy of the mitigation that has previously been approved and from a factual standpoint already implemented many years ago. You're familiar with the Taylor case? I am, Your Honor. Can you tell me which of the six categories of the Taylor case center fits? Your Honor, two responses. One, I think the Taylor case, Your Honor, is those the virtual representation construct doesn't necessarily apply here because of the State court judgment. But the categories related to would a party be reasonably expected to be bound by the judgment, Your Honor, I think those categories would apply as set forth in our answering brief. I'm not seeing that language reasonably. You have to forgive me, Your Honor. If I could grab my opinion, I can. But our principal argument, Your Honor, is actually the Taylor analysis doesn't apply in this context. And the operative analysis is set forth in the Atwell decision and other California case law. Atwell is a California case? Yes. And so because we're dealing with a State court judgment, Your Honor, as a consequence, it's California law that applies from a choice of law standpoint, not Federal law. Atwell dealt with a Federal judgment. And I think Justice Ginsburg was careful to note that that case actually dealt with a Federal judgment, not a State court judgment. And we believe the law on that point is crystal clear, including in this circuit, that has many cases, including the Kamali decision from 2021, where California law was cited, including the concepts associated with privity.  If there are no other questions, I'm prepared to submit on the papers, and I appreciate the opportunity. Aren't you going to discuss mootness? We set our positions in our papers, but a few points on mootness. We acknowledge the circuit law has some decisions that would suggest post-harvest a case could still not be moot. And there are other cases that suggest that once the trees have been felled, there's no relief available. So we acknowledge that. And in our effort to reconcile the case law, we landed in the same place, as I was picking up from some of the comments, is the through line seems to be when there's an agency involved. And perhaps there's — that distinct doesn't apply uniformly in all the cases, but that was the through line that we saw, and we think it makes great sense for the reasons already mentioned in terms of the Section 7 regime is very different than the Section 9 regime. So some of the suggestions that they've made for mitigation, do you have any idea how much that would cost? How much would it cost your client at this point? I mean, the whole point is that if you knew what that cost was going in, you might have said, you know something, we withdraw the application. And that's why an agency sort of mediating this thing and negotiating it then subject to court review of what the agency has decided are mitigating circumstances is very different from us coming in post hoc and saying, oh, let's just create a $100 million sinking fund and protect these species going forward. Your Honor, that's exactly right. My suspicion is it would be tremendously expensive to potentially comply with whatever mitigation could be imagined after the harvest has been completed. I also think on the mitigation front, to your point, just from a standpoint of planning, if you're a company, take this case. We went through years of litigation, years of permitting processes, have hundreds and hundreds of mitigation requirements already set forth in the existing term of harvest plan, only later then to have all of those issues relitigated. That that is ultimately the consequence of allowing an ESA suit to be filed against the backdrop of what this THP has already undergone. And as to the mootness point, and I think it comes through the lower court's opinion and we've referenced it, this is the third, fourth, fifth lawsuit that we've dealt with. There's been two lawsuits in Federal District Court, if that didn't come through the papers. The other lawsuit was before Judge Jehebria, identical in nature, and that lawsuit also involved a preliminary injunction proceeding. Judge Jehebria actually went with us to the property for a site visit. We went with counsel. We walked the site, and after that site visit, we held a preliminary injunction proceeding. The PI was denied, and that case actually was dismissed. And those two cases are indistinguishable. So when we hear the contention in this case that there's somehow ongoing take, when you had the identical lawsuit fully adjudicated and dismissed, it really begs the question, what's really going on here? And a point that we have tried to convey in our papers to the lower court, that these are lawsuits that are being brought just to be brought, that there have been promises that until our client chooses to sell this private land, we can expect further lawsuits. And there's been many of them, and which is why we've been fighting so hard about rest judicata. The principle finality is essential to blocking this kind of effort. And we appreciate environmental laws are critically important. We went through the state court proceeding. They achieved some successes there, and the THP wasn't enhanced. But at some point, it needs to stop. And this is our concern, that if we disallow these serial lawsuits, it sends the wrong message to businesses, and quite frankly, it makes it very challenging to actually plan. Because you don't Hold on. Hold on, counsel. Are there any additional questions? I don't have any other questions. All right. Thank you. Thank you. Thank you, Your Honors. A couple of quick follow-ups. First, the California Court of Appeals case that I noted before, that was Castillo v. Glen Eyre, 23 Cowlap 5th, 262. That is the one in which Atwell relies for privity. I direct your honors to that. Regarding a collateral attack, there cannot be a collateral attack here, because as defendants admitted in their briefing, no ESA claim was litigated at the court below. With regards to Taylor, Judge Bay, you asked which category would it have to fall in. The only category potentially available is the one that's referred to as adequate representation. In order for that to apply, you must have not only alignment of interests, but also the court either has to take care for the interests of the absent party, or the party litigating has to know they're litigating on behalf of the absent party. With regards to the... I see I'm out of time, Your Honor. All right. I'd like him to go ahead and finish the thought on mootness. If you're going to address mootness, I'd like you to finish the thought. Thank you, Your Honor. With regards to the cost of doing the mitigation measures, it hasn't been adjudicated yet, but I direct your honors to our request for relief. We request things like wood loading. This is literally putting logs into water. Reduce of sedimentation. This is simply about maintaining roads. The mitigation measures being requested here are not draconian in any way. We have not adjudicated through expert testimony what they would cost, but I would direct your honors to the specific request. And why isn't all of this really unfair surprise? Here's why I don't... This is why, Your Honor. GRT knew from the beginning that there were endangered and threatened species where they were logging. What they could have and should have done is requested an incidental take permit from the Fish and Wildlife Service and from National Marine Fisheries Service. Why didn't you come in and say that you can't proceed until you get that? That I do not... So I don't believe that is actually... Well, we did. That is our case. But you didn't... You didn't seek the PI. When you lost on the PI, you appealed it and then gave it away. Well, let me respond to that, because I think this is important for the point on vacatur, if your honors believe it's moot, which we do not. We filed the emergency motion for a stay, and the next day received their response that said the following day all the trees would be cut down. So at that point, if we came before this court and said, court, we need to use all of your resources to stop the cutting down of these trees, there would have been no emergency relief that could have been granted. There is still and was still relief that can be granted that has to do with mitigating the harm that was caused when the trees were cut down. So what we gave up, and it wasn't something we gave up, what we lost was the ability to stop the cutting of trees. And GRT is responsible for that, not the plaintiffs. As soon as the PI motion was denied, they called out every single available logger in the area, had them come down and with ridiculous speed cut down all the trees. And said in the response to our emergency motion, all the trees are cut. There's nothing to do here. So we absolutely did not give up our ability to try to save these species. And if GRT wanted to have certainty about what it needed to do to avoid the ESA, the solution was very simple. Get an incidental take permit with Habitat Conservation Plan. That would have done it. If they had done that, there would have been zero claim under the Endangered Species Act. They decided not to do that. And when they did that, they did that at their jeopardy. Why didn't you file your suit months or years before you filed it? Your Honor, I think this is an important point relative to how the state court proceedings proceeded. The project evolved throughout that period. It changed. But it still didn't occur to you that you could demand that they get an ITP? At that point, so our case that we filed said get an ITP. It said you are going to commit take without an ITP and you need to go get one. That was our suit. Why didn't we bring it before? When the proceeding was going through the state court, it constantly was changing as the plaintiff in that proceeding prevailed. But it couldn't have come as a surprise to you what they were ultimately seeking, and it can't have come as a surprise to you that you could have asked that they get the ITP from federal regulators rather than state regulators. And when you don't do that until the end of the state case, it really looks like tag team. And that's what Judge Donato was really unhappy about. And it looks really unfair. And I'd like to speak to that, Your Honor. So I have a very sophisticated client here. They're very, very experienced. And you have very good lawyers on your side. And with regards to the tag team question, right, one of the things that I'd point to is Taylor addressed this specifically and said, look, this is this concern because that was exactly the concern raised in Taylor. They said this is tag teaming. One person lost their FOIA case and another one comes and brings the exact same FOIA case. And Taylor said, look, the due process concerns here are too important to have them be obviated by a concern of tag teaming, and that tag teaming would be addressed through stare decisis. And that's an important point here because there is no stare decisis. No one has ever determined that there will not be take here or there was not going to be take. That case has never been litigated. I'd also point, Your Honors, to the fact that when this litigation was filed, the first response from GRT was a motion to dismiss based on ripeness. They said your ESA Section 9 case is not ripe because we don't know what this logging is even going to look like. And I'd also point, Your Honors, to the cases that we cite in our opening brief where you have ESA Section 9 cases that follow state court proceedings on exactly this issue. What is the project going to look like, the environmental review? Because those cases change what a project is. So it isn't a matter of strategy. It's a matter of practicality. You don't know what the project is actually going to look like until the CEQA and the Forest Practices Act case is resolved. It is also a case in state court that is based solely on an administrative record, whereas an Endangered Species Act Section 9 case is based on extrinsic evidence. So combining those together and having the state court adjudicate, one, should this project be sent back to the agency to look at again and potentially changed, and at the same time be adjudicating, not based on an administrative record, but extrinsic evidence that the project that is being sought to be changed could result in take, that as a practical matter would be untenable, which is why it never happens. Thank you, Counsel. Thank you, Your Honor. We appreciate the presentation. The matter of Friends of Guala v. Guala Redwood Timber is submitted.
judges: BYBEE, BEA, MENDOZA